UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FREDERICK THOMAS FREEMAN,

       Petitioner,

                                       Civil No: 07-10350
                                       HON. DENISE PAGE HOOD

v.

JAN TROMBLEY,

       Respondent.

_____/

## OPINION & ORDER CONDITIONALLY GRANTING
## THE PETITION FOR WRIT OF HABEAS CORPUS

## I. INTRODUCTION

This is a habeas case under 28 U.S.C. § 2254. Michigan prisoner Frederick Thomas Freeman,

("Petitioner"), who is confined at the Saginaw Correctional Facility in Freeland, Michigan, has filed

a petition for writ of habeas corpus through counsel raising the following claims: (1) Petitioner was

denied the right to make a record regarding his defense attorney's drug use; (2) ineffective assistance

of counsel; (3) ineffective assistance of appellate counsel; (4) prosecutorial misconduct; (5) actual

innocence; (6) trial court error in allowing Petitioner to be dressed in prison garb and shackles in

the presence of the jury; (7) jury instruction error; and (8) cumulative error. Petitioner was

convicted of first-degree murder, Mich. Comp. Laws §750.316. He was sentenced to life

imprisonment. For the reasons that follow, the petition will be conditionally granted.

## II. FACTUAL BACKGROUND

Petitioner's conviction arose from the shooting death of Scott Macklem, on November 5,

1986, in the parking lot of St. Clair Community College shortly before 9:00 am. The prosecution

theorizes that Mr. Macklem was murdered by Petitioner due to his jealousy of Crystal Merrill and

Mr. Macklem's relationship. Crystal Merrill is the former girlfriend of Petitioner. Ms. Merrill and Mr. Macklem were engaged to be married and were expecting their first child together. Petitioner argues that he did not commit the murder and that he was not at the scene of the shooting. Petitioner produced alibi witnesses at trial to support his theory of the case.

### III. __PROCEDURAL HISTORY__

Following Petitioner's conviction, he filed a direct appeal with the Michigan Court of Appeals raising the following claims: (1) trial court error in the admission of prior "bad acts" evidence; (2) trial court error in the admission of hypnotically induced identification testimony; (3) trial court error in its denial of Petitioner's motion for a new trial; (4) ineffective assistance of counsel; (5) trial court error in the admission of in-court identification testimony when it was improperly suggestive; (6) trial court error in its decision to deny Petitioner's motion to suppress statements made by him to the police as they were searching his home; (7) prosecutorial misconduct; (8) trial court error in its admission of rebuttal testimony from a prosecution witness; (9) trial court error in the admission of testimony from a police officer who eavesdropped on a telephone conversation between Petitioner and Ms. Merrill; and (10) insufficient evidence to sustain the charge of first-degree murder. The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Freeman,* No: 103276 (Mich. Ct. App. Sept. 13, 1993)[1].

Petitioner filed a delayed application for leave to appeal with the Michigan Supreme Court

---

[1]Prior to filing an appeal with the Michigan Court of Appeals, Petitioner filed a motion for a new trial, and a hearing was held on June 15, 1987 before the trial court. The motion was denied. Petitioner filed another motion for a new trial which was followed by another hearing on September 4, 1990. That motion was also denied.

and raised the following claims:

I.  Defendant-Appellant Frederick Freeman was denied due process and a fair trial where, over objection, the prosecutor's case rested largely on improperly admitted character evidence and likewise improper evidence of alleged bad acts, including rape, assault, extortion and electronic surveillance.

II.  The introduction of post hypnotic testimony denied defendant his right to due process of law and his right of cross-examination due to the inherent unreliability of the process of hypnosis and its outcome, the failure to preserve pre-hypnotic recall or to follow the requisite safeguards, and the corruptive effect of the suggestive, post-hypnotic identification.

III.  Defendant-Appellant Frederick Freeman was denied due process and a fair trial and the effective assistance of counsel where Rene Gobeyn, Richard Krueger and Kathleen Ballard were allowed to give identification testimony which was the product of suggestive pre-trial identification procedures.

IV.  The prosecutor and his prison inmate witness misled the jury as to the bargain for the witness' testimony, thus depriving defendant of his constitutional rights to due process and to confrontation of witnesses.

V.  Defendant-Appellant Freeman was denied due process and a fair trial where the trial court vouched for his credibility by telling the jury that Mr. Joplin had received "no favor" for testifying.

VI.  Defendant-Appellant Freeman was denied due process and a fair trial where the prosecutor's closing argument improperly shifted the burden to the defense to prove an alibi beyond a "serious doubt" by producing documentary evidence in support.

VII.  The trial court erred reversibly by failing to suppress the alleged declarations of defendant-appellant Freeman where those statements were the fruit of an unlawful search of Mr. Freeman's home and/or Mr. Freeman was denied the effective assistance of counsel where trial counsel failed to timely object to the search.

VIII.  The trial court erred reversibly by allowing the prosecution, over objection, to present so-called rebuttal evidence concerning charter air flights that was irrelevant and immaterial to the issues in the case and distracting and confusing to the jury.

IX.  The cumulative effect of the errors denied defendant-appellant Freeman a fair trial.

X.  Defendant-Appellant Freeman was improperly tried and convicted and is entitled to reversal where the prosecutor presented insufficient evidence at the preliminary examination to support a bindover on the open murder charge.

The Michigan Supreme Court denied leave to appeal. *People v. Freeman,* 445 Mich. 911; 519 NW2d 894 (1994)(table). Petitioner filed a motion for reconsideration with the Michigan Supreme Court and relief was denied. *People v. Freeman,* 522 NW2d 636 (1994).

On October 1, 2004, Petitioner filed a motion for relief from judgment in the trial court raising the following claims: (1) ineffective assistance of counsel; (2) prosecutorial misconduct; (3) defective jury instruction; (4) new law regarding concealment of promises to informants; (5) newly discovered evidence; (6) Petitioner's exposure to the jury while in prison garb; (7) the verdict was against the great weight of the evidence; and (8) insufficient evidence to sustain a first-degree murder conviction. The trial court denied Petitioner's motion on January 11, 2005. Petitioner filed a motion for rehearing and reconsideration with the trial court and relief was again denied on February 3, 2005.

Petitioner filed an application for leave to appeal with the Michigan Court of Appeals raising the following issues:

I. The defendant demonstrated a significant possibility of his innocence and the trial court abused its discretion in refusing to consider the defendant's showing of actual innocence or to order an evidentiary hearing.

II. The lower court abused its discretion in finding that the issues herein raised had been raised in previous appeals.

III. The defendant was denied the effective representation of trial counsel by virtue of trial counsel's drug addiction and activities which adversely affected his performance.

IV. Trial counsel, by virtue of his drug activities which made him a target for investigation by local law enforcement officials, was enmeshed in a conflict of interest in undertaking the representation of the defendant, who was being prosecuted by the same officials and his representation thereby rendered ineffective under *Strickland v. Washington* and it progeny.

V. Trial counsel was also enmeshed in an impermissible conflict of interest by virtue of his having been the attorney for the chief investigating officer, which conflict rendered his representation of the defendant ineffective under *Stickland v. Washington* and its progeny.

4

VI.  Trial counsel's failure to call Michelle Woodworth and other witnesses constituted ineffective representation under *Strickland v. Washington* and its progeny.

VII.  Trial counsel's obstruction of the defendant's desire and right to testify constituted a deprivation of his constitutional right to testify.

VIII.  The police threats directed at material defense witness Michelle Woodworth resulting in her nonappearance constituted prosecutorial misconduct depriving the defendant of due process guaranteed by the federal and state constitutions.

IX.  The elicitation by the prosecution of the false testimony of Philip Joplin and its concealment of promises made to him to secure his testimony constituted prosecutorial misconduct and a violation of the constitutional rights of the defendant.

X.  The repeated production of objectionable and highly inflammatory testimony and argument, the courtroom display of items shown only to inflame the passions of the jury, and the prosecutor's comment on the defendant's failure to testify constituted prosecutorial misconduct which deprived the defendant of a constitutionally fair trial.

XI.  The failure of defendant's appellate counsel to raise the issues presented in Arguments III through X above deprived the defendant of the effective assistance of appellate counsel under *Evitts v. Lucey* and its progeny.

XII.  Appellate Counsel failed to raise other significant issues in the defendant's previous appeals, including the claims that the verdict was against the great weight of the evidence, that the evidence was insufficient to support the verdict, that the defendant was exposed to the jury while in shackles and jail garb, and that the instruction given the jury on reasonable doubt was constitutionally defective.

Petitioner's application for leave to appeal was denied.  *People v. Freeman,* No: 260864 (Mich. Ct.

App. Aug. 25, 2005). Petitioner filed an application for leave to appeal with the Michigan Supreme

Court raising the same claims.  Relief was denied on January 30, 2006.  *People v. Freeman,*  474

Mich. 1025; 708 NW2d 423 (2006) (table).

Now pending before the Court is Petitioner's petition for writ of habeas corpus filed on

January 23, 2007, wherein he raises the following habeas claims:

"I.  The trial court denied the petitioner['s] due process by failing to allow the petitioner to make a record concerning trial counsel's drug addiction and activities which adversely [a]ffected his performance at the petitioner's trial and which were not argued in the

petitioner's original appeal by appointed appellate counsel.

II.  Trial counsel was ineffective when he had a conflict of interest, was impaired by a drug addiction, by failing to call petitioner's chief alibi witness, and when he obstructed petitioner from taking the stand.

III.  The failure of defendant's original appellate counsel to raise the issues deprived the petitioner of the effective assistance of appellate counsel under *Evitts v. Lucy,* 469 US 387; 105 S.Ct. 830 (1985).

IV.  There was prosecutorial misconduct and a violation of the petitioner's due process rights."

Petitioner subsequently filed with this Court a motion for leave to supplement his habeas petition [Dkt. #22]. The Court granted the motion [Dkt.#29], allowing for the following additional issues to be raised on habeas review: (1)  actual innocence; (2)  trial court error in allowing  Petitioner  to be dressed in prison garb and  shackles in the presence of the jury; (3)  jury instruction error; and (4) cumulative error.

## IV.  <u>STANDARD OF REVIEW</u>

Under 28 U.S.C. §2254(d), a petitioner is not entitled to relief in a federal habeas corpus proceeding unless the state court's adjudication of his or her due process claim resulted in a decision that: (1) was contrary to, or involved an unreasonable application of, clearly established  federal law as determined by the United States Supreme Court, or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

"Clearly established federal law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor,* 529 U.S. 362, 412 (2000). A state court decision is "contrary to" federal law "if the state court

arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 412-13.

"Under the 'unreasonable application' clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Furthermore, a federal court may not issue a writ of habeas corpus under the "unreasonable application" clause of 28 U.S.C. §2254(d) "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 365; see also *Prince v. Vincent,* 538 U.S. 634, 638-39 (2003). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable," as opposed to transforming the inquiry into a subjective one by inquiring whether all reasonable jurists would agree that the application by the state court was reasonable. *Williams v. Taylor,* 529 U.S. at 411.

## V. <u>ANALYSIS</u>

### A. Procedural Default & Statute of Limitations

Respondent argues that the habeas petition should be dismissed because it is time-barred. Alternatively, Respondent asserts that several habeas claims should be denied because they are procedurally defaulted. For the reasons set forth below the Court disagrees with both arguments and the habeas petition will be reviewed on the merits.

## B. Ineffective Assistance of Counsel

Petitioner argues that he received ineffective assistance of counsel because: (1) his defense attorney was using illegal narcotics while representing Petitioner at trial; (2) defense counsel created a conflict of interest problem; (3) defense counsel obstructed Petitioner's opportunity and desire to testify in his own defense, and (4) defense counsel failed to call Michelle Woodworth as a chief alibi witness.

To show that Petitioner was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two-prong test. In *Strickland v. Washington,* 466 U.S. 668 (1984), the United States Supreme Court sets forth the two-pronged test for determining whether a habeas petitioner has received ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. *Strickland,* 466 U.S. at 687. Second, the petitioner must establish that the deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id.*

With respect to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. *Id.* at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 689. The court must recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690.

To satisfy the prejudice prong under *Strickland,* a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Id.* at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *McQueen v. Scroggy,* 99 F.3d 1302, 1311-12 (6th Cir. 1996). Under *Strickland,* a court must presume that decisions by counsel as to whether to call or question witnesses are matters of trial strategy. See *Hutchinson v. Bell,* 303 F.3d 720, 749 (6th Cir. 2002).

## 1. Trial Counsel's Drug Use
### (Overall Performance at Trial)

Petitioner claims that defense counsel was addicted to drugs while representing him during his trial court proceedings and, therefore, was afforded ineffective assistance of counsel. Specifically, Petitioner cites the following deficiencies in his legal representation: (1) failure to object and/or move to strike the testimony of various witnesses; and (2) defense counsel's inattention to the trial court proceedings while scribbling non-sensical statements on paper. Pet. at 19-22; Pet., Ex. E.

It is undisputed that defense counsel had a substance abuse problem around the time he was serving as Petitioner's defense attorney. Pet. Ex. A, pp. 38-45; Ex. B. It is also undisputed that defense counsel was found to be ineffective during his service as counsel in a subsequent case. Pet., Ex. A, pp. 136-38. "The *Strickland* standard applies to claims of ineffective assistance of counsel due to drug use." *Muniz v. Smith,* 2009 WL 2928898, *10 (E.D. Mich. Sept. 10, 2009). An attorney's use of drugs at or around the time of his legal representation does not raise the presumption of prejudice to the client. *Id.; Burdine v. Johnson*, 262 F.3d 336, 395 (5th Cir. 2001)

("Prejudice has not been presumed for claims of denial of effective-assistance due to counsel's alleged impairment because of alcohol, drug use or a mental condition."). In order for Petitioner to be successful in receiving habeas relief on the theory that his attorney was addicted to drugs during his legal representation, he must demonstrate that he suffered prejudice as a result of defense counsel's drug use. See, e.g., *Berry v. King,* 765 F.2d 451, 454 (5th Cir. 1985).

As previously stated, Petitioner points to instances during trial where he believes defense counsel should have responded differently. With any trial of this length (spanning the course of 1 ½ months) there will be judgment calls, and no two attorneys would try the same case in the exact same way. See *Durr v. Mitchell,* 487 F.3d 423, 439 (6th Cir. 2007)("In a trial of any size, numerous potentially objectionable events occur. '[T]he Constitution does not insure that defense counsel will recognize and raise every conceivable constitutional claim.'"). If an attorney chooses not to place certain objections on the record or move to strike certain testimony, that does not conclusively mean that his legal representation is deficient or that the defendant will suffer prejudice as a result. *Id.* ("[A]ny single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice.").

The Michigan Court of Appeals addressed the issue of the admission of character and "bad acts" testimony in this case, to which no objections were made by defense counsel, as follows:

> "We believe that the trial judge was fully aware of the potential harm of admitting "bad acts" evidence and would have limited the matters now raised on appeal had defendant objected below. However, it appears that the defense purposely did not object in furtherance of a

strategy of attacking the credibility of Crystal Merrill. The defense attempted to portray Ms. Merrill as unstable and incredible. Her testimony that she continued to date defendant despite alleged "rapes" and "slave behavior" was used by the defense to challenge her credibility.

\* \* \*

While the defense strategy of attacking the credibility of Crystal Merrill did not ultimately prevail, it had the potential for success. Further we believe that a portion of the now disputed testimony was factual background relating to the prior relationship between Merrill and defendant. Some preliminary background information was necessary for the jury to understand the prosecutor's theory as to why defendant would kill a total stranger."

*People v. Freeman,* No: 103276, 1-2 (Mich. Ct. App. Sept. 13, 1993)

Petitioner also raised an ineffective assistance of counsel issue on direct appeal, but it was not based upon defense counsel's drug use. The basis of Petitioner's claim was that defense counsel did not move to suppress certain witness identification evidence. The Michigan Court of Appeals ruled as follows:

"In the instant case, after conducting a *Ginther* hearing, the trial court determined that defendant had not been denied the effective assistance of counsel. We agree. Defendant's contention that his trial counsel should have moved to suppress the photographic identification of defendant by witnesses Rene Gobeyn, Richard Krueger and Kathleen Ballard because the lineup was conducted without the presence of defendant's counsel, is without merit. At the *Ginther* hearing, defendant's trial counsel testified that he had reviewed the circumstances surrounding the photographic lineup and determined that no legal basis existed to support a motion to suppress the identification of defendant from the lineup. We find as did the trial court that defendant was not entitled to have counsel present at the photographic lineup because he was not yet the focus of the police investigation.

\* \* \*

Defendant also contends that trial counsel was ineffective because he failed to move to suppress the witnesses' identification of defendant at the corporeal lineup. We disagree. Counsel who was present at the corporeal lineup, testified at the *Ginther* hearing that he did not move to suppress witness Richard Krueger's identification because Krueger identified someone other than defendant and counsel intended to use that misidentification to impeach the witness at trial. As such, counsel's decision was a matter of sound trial strategy. Likewise, trial counsel did not move to suppress witness Rene Gobeyn's identification of defendant on grounds other than those raised by defendant on appeal. Furthermore, witness Kathleen Ballard could not identify the assailant at the corporal lineup, making suppression unnecessary."

*Id.* at 2-3.

A *Ginther* hearing was held assessing the effectiveness of counsel at trial. At the hearing, there was a finding that defense counsel provided effective assistance. The matter was reviewed by the Michigan Court of Appeals, and it agreed with the trial court findings. A review of the record demonstrates that defense counsel's drug use during trial did not prejudicially impact Petitioner's defense.

Before the trial began, defense counsel made several substantive motions on Petitioner's behalf, some of which were successful. Tr. 2/2/87, pp. 3, 24-54. Defense counsel also represented to the court that, of the 83 listed prosecution witnesses, he had interviewed each witness and traveled to Escanaba, Flint and other cities outside of the Detroit metropolitan area in order to obtain those interviews. Tr. 4/8/87, pp. 2-3. He also told the trial court that he had requested search warrants and police reports in furtherance of his discovery. *Id.* Additional motions were filed regarding venue, discovery, suppression, request for a polygraph, request for appointment of a private investigator, request to interview certain witnesses. *See, e.g., id.* at 1, 6, 9, 24-25, 33, 39, 48. Once the trial began, additional substantive motions were filed, including motions for mistrial, exclusion of hypnosis testimony and suppression. Tr. 5/1/87, pg. 652 ; Tr. 5/5/87, pg. 849; Tr. 5/7/87, pg. 1514.

In addition to the numerous motions filed by Petitioner, defense counsel's advocacy at trial cannot be deemed deficient or ineffective. As noted by the Michigan Court of Appeals and by defense counsel at his *Ginther* hearing, trial counsel had a strategy to place Ms. Merrill in a bad light with the jury by attacking her credibility. The record demonstrates the level of aggressiveness

displayed by defense counsel in an effort to discredit her incriminating testimony. Tr. 4/30/87, pp. 568-651; Tr. 5/1/87, pp. 652-55, 696-700, 726-31. Petitioner was also very aggressive with his cross-examination of Sergeant Bowns, *infra,* which is set forth in more detail below. Defense counsel demonstrated his knowledge regarding the physical evidence including shell casings, fingerprints, and weaponry, being used against Petitioner and attempted to use the evidence to Petitioner's advantage by implying that law enforcement officials may have missed or ignored pivotal evidence regarding the shotgun shell. Tr. 5/5/87, pp. 955, 974-77, 1001-04; Tr. 5/13/87, pp. 1828-1829.

Defense counsel also lessened the negative impact of Officer David Hall's testimony. Officer Hall overheard a conversation between Petitioner and Ms. Merrill and testified about several incriminating statements made by Petitioner to Ms. Merrill. However, defense counsel was able to aggressively attack Officer Hall's testimony on the grounds that the alleged incriminating statements by Petitioner attested to during direct examination were not included in the initial police report, but rather were only recalled by Officer Hall several months after the fact at trial. Tr. 5/7/87, pp. 1303-26.

Defense counsel called 21 defense witnesses. Since Petitioner was identified as wearing an army-style kind of jacket, defense counsel called Bruce Lamb to testify that the Army had an office in the area near the crime scene, which would not make it unusual to see other individuals in the area wearing army style jackets. Tr. 5/13/87, pp.1771-75. He also called Booker T. Brown, a cell-mate of Petitioner's, and Donna Henderson, a security officer at the college where Mr. Macklem was shot. Tr. 5/13/87, pp. 1754-56, 1817-19.

Reviewing the record in its entirety, the Court finds that defense counsel's overall scope of

legal representation was not prejudicial to Petitioner's case. Petitioner is not entitled to habeas relief relative to this prong of his ineffective assistance of counsel argument.

## 2. Conflict of Interest

Petitioner argues that due to a conflict of interest, defense counsel was not aggressive in his cross-examination of Sergeant John Bowns, a witness for the prosecution. Defense counsel represented Sergeant Bowns in a prior and unrelated civil employment matter.[2] Because of this relationship, Petitioner argues that defense counsel's cross-examination of Sergeant Bowns did not demonstrate a zealous representation of Petitioner rights.

Petitioner has a Sixth Amendment right to conflict free representation by his counsel. See *Smith v. Anderson,* 689 F.2d 59, 62-63 (6th Cir. 1982); see also *Gillard v. Mitchell,* 445 F.3d 883 (6th Cir. 2006). Sergeant Bowns was an investigating officer in the murder of Mr. Macklem. Petitioner asserts that his counsel was ineffective relative to his cross-examination of Sergeant Bowns, specifically as follows:

> "A review of six opportunities he had to "vigorously cross-examine Bowns contradicts the contention [that defense counsel engaged in a vigorous cross-examination]. For instance, Bowns clearly lied when he testified that the search warrant he obtained in Escanaba was for a search of certain "targeted items," as opposed to a search limited to Petitioner's person. Yet, Dean [defense counsel] never touched on this opportunity to attack Bowns' credibility. Nor did he probe into conversation that had been had between Bowns and the jailhouse informant, Philip Joplin, which would have revealed that it had been Bowns who had made the covert promises to Joplin that secured his false testimony. Nor did he raise with Bowns, either during trial or in this motion for a new trial, the fact that Bowns had made threats to Michelle Woodworth that frightened her from testifying. All were instances of police misconduct and cried out for development in Bowns' cross-examination."

---

[2] *Bowns v. City of Port Huron*, 146 Mich. App. 69; 379 NW2d 469 (1985), lv. den. 424 Mich. 898 (1986).

Pet. at 27.

The record belies Petitioner's argument. Petitioner has identified lines of questioning defense counsel could have followed during his cross-examination of Sergeant Bowns. However, the record demonstrates how defense counsel approached the trial court outside of the presence of the jury relative to Sergeant Bowns, and leveled several forms of attack against his testimony in an effort to lessen the negative impact of his testimony against Petitioner: accusations by defense counsel about the identity of the affiant on a search warrant; defense counsel's challenge to the admissibility of statements made by Petitioner to Sergeant Bowns; accusations by defense counsel that Sergeant Bowns' conduct amounted to manifest injustice; accusations by defense counsel that Sergeant Bowns was perjuring himself; accusations by defense counsel that Sergeant Bowns intimidated Michelle Woodworth into not testifying. Tr. 5/12/87, pp. 1514-18. A reading of the record reveals that despite defense counsel's choice not to attack Sergeant Bowns in the matter in which Petitioner suggests, the Court finds that defense counsel performed an adversarial, lengthy, and zealous cross-examination of Sergeant Bowns on a variety of subjects, including Bowns' lack of experience in leading homicide investigations, Bowns' mishandling of evidence during the investigation, and his having searched Petitioner's house without finding anything associated with the homicide. *See, e.g.,* Tr. 5/1/87, pp.817-25, 836-38; Tr. 5/5/87, pp. 954-56; Tr. 5/6/87, pp. 1213-39.

Although Petitioner points out other questioning and forms of attack on Sergeant Bowns while on the witness stand, he has not overcome the presumption that defense counsel's decision not to approach his cross-examination of Sergeant Bowns in the manner suggested by Petitioner was sound trial strategy. Nor has Petitioner established that an actual conflict of interest exists in this

15

case. "[A]n actual conflict of interest mean[s] precisely a conflict that affected counsel's performance as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor,* 535 U.S. 162, 171 (2002).

Only where there is dual representation involving the attorney does that presumption of prejudice standard apply. *Cuyler v. Sullivan,* 446 U.S. 335 (1980). The Sixth Circuit has interpreted *Sullivan's* presumption of prejudice standard, stating that it does not extend "to conflicts of interest other than those of multiple concurrent representation." *Smith v. Hofbauer,* 312 F.3d 809, 816 (6th Cir. 2002). Petitioner has failed to establish that defense counsel was representing Sergeant Bowns and Petitioner at the same time. Therefore, the presumption of prejudice standard does not apply. *Id.* As a result, the traditional *Strickland* standard applies in determining the issue of ineffective assistance of counsel. *Lordi v. Ishee,* 384 F.3d 189, 193 (6th Cir. 2004).

Petitioner cannot establish that counsel labored under an actual conflict of interest that adversely affected defense counsel's performance. *Mickens,* 535 U.S. at 171. Defense counsel elicited testimony from his former client, was aggressive during his cross- examination of Sergeant Bowns, challenged Sergeant Bowns' testimony before the trial court, and treated Sergeant Bowns in an adversarial manner. The Court does not find that Petitioner's assertion of the existence of a conflict of interest is a basis for his ineffective assistance of counsel claim.

### 3. Obstruction of Petitioner's Right to Testify in his own Defense

Petitioner argues that he was denied effective assistance of counsel because his defense attorney precluded him from testifying in his own defense at trial. He claims that he was, at a minimum, entitled to an evidentiary hearing on the matter so that he could make a record of the issue. It is well-established that a criminal defendant has a constitutional right to testify on his own

16

behalf. *See Rock v. Arkansas*, 483 U.S. 44, 52-53 & n. 10 (1987); *Neuman v. Rivers*, 125 F.3d 315, 318 (6th Cir.1997).

> "[I]t has been held that a barebones assertion by a defendant [even one] made under oath, is insufficient to require a hearing or other action on his claim that he has a right to testify in his own defense and it was denied him. It is just too facile a tactic to be allowed to succeed. Some greater particularity is necessary – to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim"

*McCoy v. Bock*, No. 01-10052, 2003 WL 22994984, *11 (E.D. Mich. Dec.17, 2003) (quoting *Underwood v. Clark*, 939 F.2d 473, 476 (7th Cir. 1991), and citing *Chang v. United States*, 250 F.3d 79, 84-85 (2nd Cir. 2001); *Sciliano v. Vose*, 834 F.2d 29, 31 (1st Cir. 1987)).

> "A defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel. At base, a defendant must alert the trial court that he desires to testify or that there is a disagreement with defense counsel regarding whether he should take the stand. When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred from the defendant's conduct. Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire."

*Hodge v. Harberlin*, 579 F.3d 627, 639-40 (6th Cir. 2009) (citations omitted); (quoting *United States v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000)).

In this case, Petitioner attests in a self-serving affidavit that trial counsel precluded him from testifying at trial. Petitioner does not present any evidence other than his own assertions, which allege that he was misled or believed he was not allowed to testify; he was threatened into not testifying; and he was uninformed about his constitutional right to testify in his own defense. Petitioner stated in his affidavit:

> "Affiant strongly desired to testify in his defense. Based upon his conversations with Mr. Dean, he assumed he would be called to testify. However, Mr. Dean – despite affiant's protests and without his consent – declined to call affiant to the stand. When affiant wished to protest to the court his counsel's refusal to call him, the court refused to hear him, telling

him he would have to address the court through his attorney. The only explanation offered affiant by Mr. Dean was that affiant had been present during the trial and would for that reason not be allowed to testify. Affiant was at no time told that he had an absolute right to testify in his defense. Mr. Dean also threatened to withdraw from the case when affiant demanded to be allowed to tell the court that he wanted to testify.

If affiant had been permitted to testify, he would have testified in great detail about his complete innocence of this crime; that he would have contradicted much of Ms. Merrill's testimony; that he would have detailed her obsession with him; that he would have contradicted many of the false statements elicited about his character by the prosecution; that he would have contradicted many factually inaccurate statements made by prosecution witnesses; that he would have provided more detailed evidence of his alibi on the days before, during and after the crime; that he would have explained the exact nature of the phone calls between himself, Sgt. Bowns and Ms. Merrill; that he would have contradicted the testimony of Sgt. Hall regarding the comments attributed to him in the phone call to Ms. Merrill on November 13, 1986; that he would have offered testimony as to the suggestive lineup procedure employed by the investigating officers; that he would have testified that he never owned or possessed a shotgun; that he would have testified that he at no time had any ill feelings toward Mr. Macklem or any reason to do him harm; that he never in any way acknowledged to Mr. Joplin any involvement in this crime. He would further have offered other substantial and material evidence to establish his innocence of this offense."

Pet., Ex. D, ¶¶40, 41. This claim was not raised on direct appeal, however, Petitioner asserts that he requested that his appellate attorney raise the issue and he failed to do so. *Id.* at ¶¶ 48, 49.

Michelle Woodworth, Petitioner's ex-girlfriend, also stated in her affidavit: "[a]fter the trial in which Frederick Freeman was convicted of murder, attorney Dean told her that he had made a mistake by not allowing Frederick Freeman to testify at trial." Pet., Ex. G, pg. 5, ¶31. Finally, in a May 19, 1987 article in the "Times Herald," jurors from Petitioner's trial were interviewed afterwards and one of them said: "[a]nd if he was so innocent, why didn't he testify himself and tell us he didn't do it.'" Pet., Ex. M.

Here, although the record supports that Petitioner in fact did not testify in his own defense and there is no trial record evidence to support Petitioner's assertions that he tried to exercise his

constitutional right to testify with his defense attorney and with the trial court judge, Petitioner's affidavit provides a sufficient amount of detail explaining why there would be no record of his efforts to testify in his own defense. A disagreement between defense counsel and Petitioner would not necessarily make its way to the record. Also, if the trial judge only heard from Petitioner through defense counsel, Defendant would not have had an opportunity to express his concerns to the trial judge. Petitioner would only be left with his own account of what transpired relative to his inability to testify.

The Court is aware that self-serving affidavits are reviewed with suspicion and skepticism as they are typically drafted for the purpose of supporting the affiant's position in a case. However, if the affidavit is detailed or contains particulars which would "give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim," the affidavit would be sufficient evidence to support habeas relief. See *McCoy,* No. 01-10052, 2003 WL 22994984, *11. Petitioner's affidavit amounts to more than "bald assertions." The affidavit sets forth specific and factual details regarding Petitioner's attempts to testify at his trial. He states that defense counsel failed to tell Petitioner that he had a constitutional right to testify and Petitioner was unaware of that fact. Petitioner states that his attorney threatened to abandon his case if he persisted with his efforts to testify in his own defense. Petitioner states that he tried to tell the judge of his desire to testify and would not be heard. Petitioner states that he told his attorney of his desire to testify and was rejected. Petitioner goes on to state what he would have testified to if he had been given the opportunity to testify in his own defense.

"[D]efense counsel's role is to advise the defendant whether or not the defendant should take the stand, but it is for the defendant, ultimately, to decide." *Webber*, 208 F.3d at 550-51. As noted,

19

a defendant must "alert the trial court" that he desires to testify or that there is a disagreement with defense counsel regarding whether he should take the stand. If the defendant fails to do so, waiver is presumed. *Id.* at 551. In this case, Petitioner provides a sworn statement that he did alert the judge and that there was a disagreement with his attorney. The Court finds that Petitioner did all that he could do to exercise his right to testify in his own defense and was not only precluded from doing so, but also prevented from making a record of the claim. Habeas relief is therefore warranted on this claim.

### 4. Failure to Call Michelle Woodworth

Petitioner argues that defense counsel was ineffective due to his poor decision to not call Michelle Woodworth as a witness. Petitioner asserts that Ms. Woodworth, his live-in girlfriend at the time, would have provided an alibi for Petitioner. She would have also provided testimony disputing the theory that Petitioner was an obsessive ex-boyfriend who was so jealous of Ms. Merrill's and Mr. Macklem's relationship that he was driven to kill Mr. Macklem. Petitioner asserts that Ms. Woodworth would have testified that it was Petitioner who wanted to sever the relationship with Ms. Merrill.

A review of the record indicates that defense counsel's decision to not call Ms. Woodworth may have been one of strategy because the record reflects that defense counsel clearly knew about Ms. Woodworth, but: (1) chose to use unrelated, unimpeachable, and more reliable alibi witnesses to support his defense theory; (2) had trouble locating her after she appeared to leave town; and (3) was not sure if he wanted to use her as an alibi witness because of her tumultuous relationship with Petitioner and her untruthfulness in the past. Mot. New Tr. 6/15/87, pp. 9-13, 15-16.

However, during Petitioner's first motion for a new trial, defense counsel argued as a basis

for the motion that Michelle Woodworth's testimony was newly discovered evidence as she was then prepared to submit to polygraphs and/or provide testimony to support the fact that Petitioner was with her at the time Macklem was being murdered.  *Id.* at 5.   The trial court denied Petitioner's motion for a new trial and stated as follows:

> Well, I am not satisfied that the purported evidence the defense wants to elicit from this witness is newly discovered.  Whatever the young lady knew she knew from the outset. From the trial it was clear to me that the parties had had an ongoing and close relationship. If, as it appears from Defendant's Counsel's argument now, that her testimony was so critical, and obviously if she claims that she was with him at 9:00 in the morning there could be no evidence that is more critical to his defense, every effort should have been made by the defense to preserve that witness and preserve that testimony.
>
> As Mr. Cleland has pointed out, there are ways with the assistance of the Court that testimony can be preserved or material witnesses can be held to account.  None of those things were done in this case.
>
> Because the Court feels the evidence in question was not newly discovered and because it is very clear to the Court that reasonable diligence was not exercised in securing the attendance of that witness or in some way preserving her testimony, a Motion for a new trial must be denied.

*Id.* at 15.  Additionally, although the prosecutor stated at the hearing that he concluded defense counsel's basis for not endorsing Ms. Woodworth as an alibi witness was strategic, he also said the following:

> Her name nowhere appears on either of Mr. Dean's alibi notices; neither hers nor the other young woman we have heard talk about who at the moment her name escapes me.  But in any event, there was no attempt by the defense to raise these before the trial; to ask leave of the Court for any assistance; to ask the Prosecution for any assistance in finding a witness. Under the statute, which may be allowable, I wouldn't guarantee that at the moment, but at least there is a procedure that is laid out in the statute to ask the assistance of the Prosecution in locating important witnesses.  None of that was done.  None of that was even attempted.

*Id.* at 9. By defense counsel's own admission, some of the reasons for not calling Ms. Woodworth as a witness at trial still existed at the time of the motion hearing for a new trial, for example, her troubled relationship with Petitioner.  Despite that fact, he still asked the trial court to accept her

testimony as newly discovered so that it could be heard at a new trial. Defense counsel stated as follows:

> She has indicated to me that she no longer wants anything to do with Defendant Frederick Freeman. That although the Prosecution claims that she was dominated by him, she says no, although there may have been some mistreatment and she no longer wants to be associated.

*Id.* at 5. Moreover, Ms. Woodworth's affidavit testimony states as follows:

> "25. Following Frederick Freeman's arrest, she made herself available to his attorney, David Dean, whom she saw on a virtually daily basis while, according to her understanding, he was preparing for the trial of Frederick Freeman. She told attorney Dean everything reflected in this affidavit, and all information within her knowledge concerning Frederick Freeman and his non-involvement in the death of Scott Macklem.
>
> * * *
>
> 29. Both attorney Dean and Detectives Bowns and Hudson were aware that she had gone to live with her mother and that Mr. Dean's office was in contact with her mother before the trial of Frederick Freeman. She assume[d] she would be called to testify at the trial by attorney Dean, but she was never requested to do so, nor did she ever receive a subpoena to appear for the trial of Frederick Freeman. Attorney Dean never told her that he would not call her as a witness, or give any reason why he would not do so."

Pet., Ex. G, pp. 4-5. The testimony set forth in Ms. Woodworth's affidavit not only would have provided a strong alibi for Petitioner, but it contradicts defense counsel's representations that she was uncooperative and that he did not know how to contact her for purposes of securing her trial testimony. Therefore, for defense counsel to fail to preserve her testimony or endorse her as an alibi witness, regardless of whether he was certain that she would be called as a witness, is as described by the trial court as a failure to exercise "reasonable diligence."

The Court finds that defense counsel's failure to preserve the opportunity to call Ms. Woodworth as an alibi witness constituted deficient performance. In light of the fact that Ms. Woodworth's testimony provided Petitioner with a solid alibi – that Petitioner was with her at the

time Mr. Macklem was murdered – prejudiced Petitioner's defense. The Court finds that defense counsel's error was so serious that it deprived Petitioner of a fair trial or appeal. Habeas relief is warranted on this issue.

## C. Prison Garb & Shackles

Petitioner argues that he was "paraded in front of his jury in prison garb and fully manacled" Pet. at 34. Petitioner states in his habeas petition that "[n]o reason was advanced for these measures." *Id.* at 35. However, Petitioner's affidavit reads as follows:

> Prosecutor Cleland, claiming falsely that affiant was "planning an escape," used this explanation to justify the affiant being initially brought to the courtroom each day in shackles and jail garb[3] and shown to the jury while so shackled. When affiant tried to bring this to the attention of the trial judge, he was told to communicate it through his attorney. Affiant related this on several occasions to his attorney, Mr. Dean, but Mr. Dean failed to call it to the attention of the court.

Pet. Ex. D, ¶32. Respondent does not address the issue in its responsive pleading.

Compelling a defendant to wear identifiable prison attire at trial can violate the constitutional right to due process because it impairs the presumption of innocence so basic to our adversary system. *Estelle v. Williams,* 425 U.S. 501, 504-05 (1976). Use of visible shackles during the guilt or penalty phases of a trial is forbidden under the Constitution "*unless* that use is 'justified by an essential state interest' - such as the interest of courtroom security - specific to the defendant on trial." *Deck v. Missouri*, 544 U.S. 622, 624 (2005) (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986)) (emphasis in original).

---

[3]The record reflects that Petitioner had exhibited during the trial potentially unmanageable and disturbing behavior, such as outbursts and verbal threats, which prompted the prosecutor to request that Petitioner be restrained for the safety of everyone in the courtroom.

Initially, during pre-trial motions, voir dire, and during the first part of the first witness' testimony, it appears from the record that Petitioner was brought to the courthouse in prison garb, passed the jury room, and subsequently changed into civilian clothing in an office outside of the courtroom. Tr. 4/30/87, pg. 446. The trial court judge grew impatient with this practice because following Petitioner's arrival to court, everyone would be required to wait an additional 25 minutes for Petitioner to get dressed. *Id.* Therefore, the trial judge requested that the prosecutor facilitate Petitioner getting dressed before he came to court so that the trial proceedings could begin on time, and the courthouse would not be used as a dressing room. *Id.* at 446-47.

From the time during the testimony of the prosecutor's first witness until the conclusion of the trial, Petitioner no longer arrived at court in prison garb. For the limited number of times Petitioner did arrive to the courthouse in prison garb, he claims that habeas relief is warranted since the jury saw him when he passed by the jury room.

The record does not reference Petitioner being shackled, but only that he was wearing "jail house greens." Even assuming he was shackled and in prison clothing during the initial portion of the trial, there is no evidence in the record, except for Petitioner's representation, that the jurors saw Petitioner in prison garb and shackles. Even if the jurors did see Petitioner, the Supreme Court's holding in *Deck* is limited to visible restraints during trial. *Mendoza v. Berghuis*, 544 F.3d 650, 654 (6th Cir. Oct. 15, 2008). "[T]he Supreme Court has not held that a defendant's constitutional rights are violated when jurors see him shackled during transport to or from the courtroom." *Id.* at 655. "[J]urors may well *expect* criminal defendants . . . to be restrained during transport to the courtroom." *Id.* at 655 (emphasis in original). As the *Mendoza* court observed, although "there is authority from the [Sixth Circuit] to the contrary, [*s*]*ee e.g.,* [*United States v.*] *Moreno,* 933 F.2d

[362,] 368 [(6th Cir. 1991)], . . . the predicate for [petitioner's] claim -- 'clearly established federal law, as determined by the Supreme Court of the United States' -- is absent here." 544 F.3d at 655-56. When the trial court requested that the prosecutor assist in facilitating Petitioner being brought to court in civilian clothing, the record only reflects that the judge's reasoning was purely based upon his desire to be efficient and save time. Contrary to the implications in Petitioner's pleadings, the trial court does not indicate any concern on the record regarding Petitioner's claim of a possible constitutional violation resulting from arriving at court in prison garb, unlike that which is implied in the Petitioner's pleadings. Therefore, Petitioner was not denied his right to a presumption of innocence and a fair trial. Since there has been no unreasonable application of *Estelle* or *Deck,* habeas relief is not warranted on this claim.

### D. Improper Jury Instruction

Petitioner claims that the trial court erroneously instructed the jury regarding the concept of reasonable doubt. An erroneous jury instruction warrants habeas corpus relief only where the instruction "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). "[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional] right." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (quoting *Cupp*, 414 U.S. at 146). The jury instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147). The court must "inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

A federal court may not grant the writ of habeas corpus on the ground that a jury instruction was incorrect under state law, *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991), and "[a]n omission[] or an incomplete instruction[] is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). On habeas review, this Court is bound by the state court's interpretation of state law. *Bradshaw v. Richey*, 126 S. Ct. 602, 604 (2005).

Petitioner claims that the trial court erroneously instructed the jury on reasonable doubt because the trial court used the phrase "moral certainty" in its reasonable doubt instruction "which tells the jury that a doubt 'based on the possibility of the innocence of the defendant' is not reasonable doubt." Pet. at 36. Petitioner argues that this language is misleading and fails to provide "constitutionally adequate due process" *Id.* The trial court issued the following reasonable doubt jury instruction:

> Basic to our system of criminal justice is the principle that a person accused of a crime is presumed to be innocent. This presumption of innocense starts at the very beginning of this case, and continues throughout the trial, and during deliberations. Each and every one of you must be satisfied beyond a reasonable doubt after deliberating, that the defendant is guilty before you can return a verdict of guilty. You must begin your deliberations with the presumption of innocence foremost in your minds.

> The fact that the defendant was arrested and is on trial is no evidence against him. There must be evidence introduced in this trial that convinces you of the defendant's guilt beyond a reasonable doubt. The law does not require a defendant to prove his innocence or to produce any evidence whatsoever. The burden of proving guilt is upon the prosecution throughout the entire course of the trial, and at no time does the burden of proof shift to the defendant.

> Unlike civil cases the burden of proof is higher in criminal cases and the prosecution must prove guilt. If for any reason, after considering all of the evidence in this case, you are not satisfied that every element has been proven beyond a reasonable doubt, then you must find the defendant not guilty.

A reasonable doubt is a fair, honest doubt growing out of the evidence or lack of evidence in this case, or growing out of any reasonable or legitimate inferences drawn from the evidence or the lack of evidence. It is not merely an imaginary doubt or a flimsy, fanciful doubt, or a doubt based upon the mere possibility of the innocence of the defendant, or a doubt based upon sympathy, but rather it is a fair, honest doubt based upon reason and common sense. It is a state of mind which would cause you to hesitate in making an important decision in your own personal life.

By stating that the prosecution must prove guilt beyond a reasonable doubt, I mean there must be such evidence that causes you to have a firm conviction to a moral certainty of the truth of the charge here made against the defendant.

Tr. 5/15/87, pp. 2032-34

It is, of course, beyond debate that the state must prove each element of a charged offense beyond a reasonable doubt in order to sustain a conviction. *See In re Winship*, 397 U.S. at 363. On habeas review, the proper inquiry for a court assessing a reasonable doubt instruction is whether there is a reasonable likelihood that the jury did apply the jury instruction in an unconstitutional manner. *Victor v. Nebraska*, 511 U.S. 1, 6 (1994). Here, Petitioner contends that the reasonable doubt instruction was deficient because it contained language referring to "moral certainty" and "the possibility of innocence" that reduced the prosecution's burden of proof. Petitioner believes that the term "moral certainty" in the reasonable doubt instruction impermissibly lowered the burden of proof. In *Cage v. Louisiana*, 498 U.S. 39, 40-41 (1990), the Supreme Court held that an instruction that defined reasonable doubt in terms of "grave uncertainty" and "actual substantial doubt," and required conviction based upon "moral certainty," could have been interpreted by a reasonable juror as allowing a finding of guilt based upon a degree of proof below that required by the Due Process Clause. *Cage*, 498 U.S. at 41 (1990). In reversing the conviction, the Supreme Court found that terms like "substantial" and "grave," in common parlance, "suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard." *Id*. When combined with the reference

to moral certainty, a reasonable juror could have been confused by the instruction and interpreted it to overstate the required degree of uncertainty. *Id.*

In *Victor v. Nebraska*, the Supreme Court limited its holding in *Cage*, reasoning that the mere use of the term "moral certainty" in a jury instruction defining reasonable doubt by itself did not violate due process. The Court determined that the term "moral certainty," read in the context of the instruction in *Victor*, merely impressed upon the jury the need to reach a subjective state of near-certitude of guilt. The Court found no reasonable likelihood that the jury would have understood the phrase to be disassociated from the evidence in that case. 511 U.S. at 14-16. The Court also found that use of the term "moral certainty" in the Nebraska jury instruction on reasonable doubt did not violate due process because the jurors were further instructed that they had to have an abiding conviction as to the defendant's guilt; the instruction equated doubt sufficient to preclude moral certainty with doubt that would cause a reasonable person to hesitate to act; and the jurors were told that they should be governed solely by the evidence introduced before them, without indulging in speculation, conjectures, or inferences not supported by the evidence. *Id.* at 21-22. The Court distinguished these jury instructions from the instruction found unconstitutional in *Cage*, noting that in *Cage* the instruction merely told the jury that they had to be morally certain of the defendant's guilt without any additional explanations that would give meaning to the phrase "moral certainty." *Id.*

The Sixth Circuit has held that the use of the term "moral certainty" does not automatically render a jury instruction on reasonable doubt fundamentally unfair. In *Austin v. Bell*, 126 F.3d 843, 847 (6th Cir. 1997), the Sixth Circuit Court of Appeals ruled that a reasonable doubt instruction,

which stated that moral certainty was required to convict the defendant on a criminal charge, did not impermissibly lower the burden of proof. The instruction in that case included an additional statement that reasonable doubt was engendered by "an inability to let the mind rest easily" after considering all of the proof in the case. *Id.* That language, the court believed, lent content to the phrase "moral certainty." *Id.* In context, the court concluded, the phrase did not create a reasonable likelihood that the jury impermissibly applied the jury instruction. *Id; see also Cone v. Bell*, 243 F.3d 961, 971-72 (6th Cir. 2001), *reversed on other grounds by Bell v. Cone*, 535 U.S.685 (2002).

This Court believes that the reasonable doubt instruction in this case cogently conveyed to the jurors the degree of certainty they needed to possess according to the Constitution before they could convict. The trial court also instructed the jury that the Petitioner was presumed innocent; the burden of proof never shifted from the prosecution; and the Petitioner was not required to come forward with any evidence. The Petitioner is therefore not entitled to habeas relief on this claim.

### E.  Prosecutorial Misconduct

Petitioner presents five arguments in support of his prosecutorial misconduct claim: (1) Michelle Woodworth, an alibi witness for Petitioner, was harassed and threatened into not testifying by Sergeant Bowns and Officer Hudson; (2) the jailhouse informant was made promises for his testimony against Petitioner and those promises were concealed; (3) the prosecutor made a reference during his closing argument about Petitioner not taking the stand; (4) the prosecutor made inflammatory remarks in front of the jury; and (5) the prosecutor used irrelevant and prejudicial testimony and evidence.

The United States Supreme Court has stated that prosecutors must "refrain from improper

methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). The Sixth Circuit has adopted a two-part test for deciding whether prosecutorial misconduct violates a defendant's due process rights. *See Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) (citing cases). First, the court must determine whether the challenged statements were indeed improper. *Id.* at 452. Upon a finding of impropriety, the court must decide whether the statements were flagrant. *Id.*

Flagrancy is determined by an examination of four factors: 1) whether the statements tended to mislead the jury or prejudice the accused; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before a jury; and 4) the total strength of the evidence against the accused. *Id.*; *see also Boyle v. Milton*, 201 F.3d 711, 716 (6th Cir. 2000) (citing *United States v. Francis*, 170 F.3d 546, 540-550 (6th Cir. 1999)). "[T]o constitute the denial of a fair trial, prosecutorial misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial,' or 'so gross as probably to prejudice the defendant.'" *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (citations omitted).

### 1. Jailhouse Informant's Concealment of Promises

Petitioner argues that Philip Joplin, a jailhouse informant, was given consideration in exchange for his testimony against Petitioner. Petitioner also asserts that Joplin was intimidated into providing incriminating testimony against Petitioner. Since Joplin's testimony was tainted and very damaging to Petitioner's case, as a result of the promises made in exchange for his testimony, Petitioner asserts that habeas relief is warranted.

Joplin testified at trial that while temporarily housed in a holding cell with Petitioner, for unrelated reasons, Petitioner admitted to shooting and killing Mr. Macklem. Tr. 5/7/87, pp. 1348-49. He also testified that he was not offered anything in exchange for his testimony. *Id.* at 1354. In fact Joplin admitted that he initiated contact with the prosecutor's office to inform them about Petitioner's admissions. *Id.* at 1353-54. Joplin's reason for coming forward was to change his "prison mentality." *Id.* at 1354.

Approximately three years later at Petitioner's second motion for a new trial, on September 4, 1990, Joplin stated that he did receive consideration for his testimony in the form of not being required to return to prison. Tr. 9/4/90, pg. 44. Joplin stated that his parole agent made the promise regarding his shortened prison term. *Id.* Joplin was in fact released from prison early. However, at the same hearing, Joplin stated that no one from the prosecutor's office offered any inducements, made him any promises of leniency, or offered anything else in exchange for his testimony against Petitioner. *Id.* at 51.

Approximately four years later on July 15, 1994, Joplin executed an affidavit recanting his testimony that Petitioner admitted to shooting Mr. Macklem and claimed that he made up the story as leverage to receive some type of consideration in return. Pet., Ex. J, ¶¶ B, C. The affidavit also reiterated the fact that he was made promises in exchange for his testimony against Petitioner. *Id.* at ¶ H. Joplin also states in the affidavit that he was coached by law enforcement officials and prosecutors in order to prepare him for his testimony at trial against Petitioner. *Id.* ¶¶ I, M.

In this case, the Court finds that although there is evidence offered by Petitioner to establish the existence of an undisclosed cooperation agreement and that a prosecution witness' trial testimony was perjured, "[r]ecanting affidavits .. . are viewed with extreme suspicion." *U.S. v.*

*Chambers,* 944 F.2d 1253, 1264 (6th Cir. 1991). Here, such suspicion is warranted.

First, the affidavit comes seven years after Petitioner's conviction, and four years after Petitioner's motion hearing for a new trial. At trial in 1987 and at the hearing in 1990, Joplin testified that the prosecutor's office promised him nothing and he received no consideration for his testimony. It is only in his 1994 affidavit that he states that he received consideration from the prosecutor's office. Second, Joplin added new facts to his 1994 affidavit that had not been mentioned before. Not only was he promised a shortened prison term, but prosecutors and law enforcement officials were coaching him in preparation for his trial testimony and threatening him with an extended prison sentence and perjury charges if he failed to cooperate. Finally, Joplin's initial testimony was consistent with other substantial evidence in the trial record.

Having reviewed the affidavit, the Court finds Joplin's affidavit to be credible and grants habeas relief for the reasons set forth below. First, Joplin was suffering from a series of illnesses which resulted in a terminal prognosis, at the time he executed his affidavit. He was suffering from Liver Cirrhosis, Hepatitis C, Agent Orange poisoning and a double abdominal hernia, and was given 6 -12 months to live. Pet., Ex. J, ¶ T. Joplin stated, during the last interview on July 2, 1994, that he had pneumonia and felt he had little time left. He claimed "a prison physician recently advised him his condition is terminal and he has approximately six to twelve months to live." *Id.* at ¶ V. Joplin has since passed away.

Joplin's 1994 affidavit was put together by Allen B. Woodside, a private investigator. He met with Joplin on three separate occasions while Joplin was incarcerated, on April 21, 1993, June 29, 1993, and July 2, 1994. At the end of the affidavit, Mr. Woodside states as follows:

I affirm this information was derived and recounted from the statements and answers of

Philip Joplin in reply to my questions concerning his involvement and his role in the case of People v. Temujin Kensu, a/k/a Frederick T. Freeman.

I attest to this information being an accurate and correct representation of all Philip Joplin's admissions, confessions, disclosures, explanations and clarifications as stated, revealed or otherwise expressed by him to me, and as understood, recounted, interpreted and represented by me in the body of this Affidavit from A to Z.

*Id.* at 18. Also present during the interview was Bill Proctor, an investigative reporter with WXYZ-TV 7 News. The interview was professionally videotaped. Joplin's affidavit testimony spans 18 pages and is extremely detailed, naming officers and assistant prosecutors who were engaged in forcing Joplin to testify against Petitioner. Joplin admits that he started this series of events by contacting the prosecutor's office in the first place, but he did not realize exactly what he was getting himself into when he volunteered to be a jailhouse informant. *Id.* at ¶ J. His reason for coming forward at that time, seven years after the fact, was to clear his conscience. *Id.* at ¶ X. He states as follows:

X. Joplin wishes to clear his conscience while he still has time. Joplin admits to his Perjury during the trial in 1987 and the Motion for New Trial Hearing in 1990, but he firmly and resolutely states, it was not of his own free will and accord. Joplin stated, his letter and testimony created a situation that led to the wrongful conviction of an innocent man and he wishes to clear his conscience by confessing and recanting the false statements he gave in testimony that led to Freeman's conviction.

Y. Joplin indicated, he is no longer afraid or reluctant to truthfully and totally disclose his involvement and role in Frederick Freeman's case because of his impending circumstances, however he is concerned that other inmates in the prison population do not become aware of his identity in respect to his confessions and admissions.

Z. Joplin acknowledges, the fears that kept him from reversing his testimony against Freeman are now a reality. Joplin states, he wishes to tell the truth for no other reasons than for the benefit of Frederick Freeman.

*Id.* at ¶¶ X - Z.

It is well established that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnote omitted); *accord Napue v. Illinois*, 360 U.S. 264, 271 (1959). This is true whether the false testimony goes to the defendant's guilt or to a witness's credibility, and it matters not whether the prosecution directly elicits the false testimony or merely allows false testimony to go uncorrected. *See Napue*, 360 U.S. at 269-270. It is equally well-established, however, that petitioner bears the burden of proving that the testimony amounted to perjury. As the Fourth Circuit has explained, "[a] defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured. Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987); *accord United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990) ("[N]ot every testimonial inconsistency that goes uncorrected by the government establishes a constitutional violation."); *Horton v. United States*, 983 F. Supp. 650, 657 (E.D. Va. 1997); *United States v. Hearst*, 424 F. Supp. 307, 318 (N.D. Cal. 1976).

To succeed on this claim petitioner must show that: (1) the prosecutor presented evidence which was false; (2) the prosecutor knew or should have known of the falsity; and (3) the evidence was material. *See Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1999). As the *Verser* court further explained, to establish a constitutional violation petitioner must show that the "inconsistent testimony amounted to perjury, 'the willful assertion under oath of a false, material fact.'" *Verser*, 916 F.2d at 1271 (quoting *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984)); *see also*, *Horton*,

983 F. Supp. at 657 (quoting *United States v. Smith*, 62 F.3d 641, 646 (4th Cir. 1995)) (in order to establish a *Napue* violation, defendant must show that the government knowingly used perjured testimony, perjury being "false testimony concerning a material matter, 'given with the willful intent to deceive (rather than as a result of, say, confusion, mistake, or faulty memory.'"). In other words, petitioner must show that the testimony was "indisputably false." *Byrd v. Collins*, 209 F.3d 486, 817-18 (6th Cir. 2000).

As the Sixth Circuit has explained, in order for a witness' perjury at trial to constitute a basis for habeas relief, the petitioner must show "prosecutorial involvement in the perjury." *Burks v. Egeler,* 512 F.2d 221, 229 (6th Cir. 1975); see also *King v. Trippett,* 192 F.3d 517, 522 (6th Cir. 1999).

Here, assuming the truth of Joplin's affidavit and the hearsay assertions contained within that affidavit, there is no question that Joplin knowingly testified falsely at trial when he testified that Petitioner told him that Petitioner shot and killed Mr. Macklem, and that the prosecutors should have known his testimony was untruthful. As noted above, however, to be entitled to habeas relief on this claim Petitioner must also show "a reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103. From a May 19, 1987 article in the "Times Herald," jurors from Petitioner's trial were interviewed and the article read in part as follows:

> "Another juror said it was the testimony of Phillip Joplin, 38, that convinced her of Freeman's guilt. Joplin shared a courtroom cell for two hours with Freeman and testified that Freeman told him he had shot Macklem and had an airtight alibi. 'His alibi was too perfect. He called too many people,' she said. 'And if he was so innocent, why didn't he testify himself and tell us he didn't do it.'"

Pet., Ex. M.

Throughout Joplin's affidavit it is clear that he made it known on several occasions to the law enforcement officials and prosecutors that were "coaching" him and "manipulating" his testimony that he no longer desired to go through with testifying against Petitioner. However,

> Joplin further indicated, he never came right out and discussed his feelings about Freeman, and although he had not openly admitted to anybody that his letter about Freeman was untrue, he believes the police and prosecutors must have suspected, or at least considered, he falsely implicated Freeman for his own benefit at Freeman's expense.

*Id.* at ¶ K. The Court finds that the totality of the circumstances surrounding the content of Joplin's affidavit and the effect his testimony had on the jury requires that habeas relief be granted on this issue.

## 2. Threats Against Michelle Woodworth

Petitioner claims that his chief alibi witness, Michelle Woodworth, was harassed and threatened by Sergeant Bowns and Sergeant Hall in an effort to scare her into not testifying for Petitioner. Where such acts are committed by law enforcement officers, they are attributable to the prosecution. *See United States v. Turner*, 490 F.Supp 583 (E.D. Mich. 1979)("Even if the [prosecutors] were totally ignorant of the agents' activities and deceptions, the Government still remained responsible for any and all of their actions. The agents were nothing less than an 'arm of the prosecutor.'")(quoting *United States v. Morrell*, 524 F.2d 550, 555, 603 (2d Cir. 1975)).

In support of this claim, Petitioner relies upon a report/complaint Ms. Woodworth filed with the police and her affidavit testimony. The report states as follows:

> "Michelle Woodworth, girlfriend of Frederick Freeman, came to this office and complained that Detective John Bowns had been harassing her by questioning her in regards to if she was withholding any information regarding the murder investigation. She also stated that Bowns threatened her that she would go to jail if she withheld information and that she had also told this information to a female acquaintance of her's.

I informed Michelle that I would speak to Sgt. Bowns and also told her that our detectives have the right to investigate this crime and very well might warn her that if she withholds information that she could be charged.

I, in turn, asked her how we could get in touch with her, and she stated that if Sgt. Bowns . . . wanted to talk to her, they would have to go through her attorney David Dean."

Pet. Ex. I. This report does not prove that Sergeant Bowns actions in attempting to obtain information from Ms. Woodworth rise to the level of prosecutorial misconduct. Ms. Woodworth's affidavit, although more detailed, including an allegation that she was threatened with perjury charges and the loss of her newborn child, is largely in line with what she told the police. Pet., Ex. G, pp. 4-5. As Petitioner suggests, an evidentiary hearing would have resolved this issue. However, as stated, the Court finds no merit in this claim.

### 3. Prosecutor's Comment on Petitioner's Failure to Testify

Petitioner contends that the prosecutor impermissibly commented on his failure to testify. During closing argument, commenting on a conversation between Ms. Merrill and Petitioner which was overheard by Sergeant Hall, the prosecutor stated:

I give you Sergeant Hall who listened on this conversation. And then Crystal, trying to keep this conversation going, talks with Mr. Freeman and says well, How did you know? What about all these things you said you could hear conversations in my home? Oh, he says, anybody can get those things. Is that a denial folks? Is that a denial of what she just said? I don't think so.

Or, what about that time that you told me that you had that girl's legs broken because she wouldn't do what you wanted her to do, you know, you sent those other two girls in to break her legs? Oh, he says, they just jumped on her legs until the knees popped out of joint. That wasn't really very serious. Is that a denial? You call that not something that supports this story of terror and psychological pressure that she'd been under for those months that she knew him? I beg to differ.

I think that that testimony, indeed, and interestingly enough testimony from the defendant,

without him getting on the witness stand, but things that were from his own lips, statements from this whiz kid who was smarter than the police, who wouldn't say anything to trip himself up, according to his own analysis. But these statements by him remembered by Crystal and by Detective-Sergeant Hall do, in fact, support exactly the things that she was talking about.

Tr. 5/14/87, pg. 2003. Petitioner simply states that the phrase "testimony from the defendant, without him getting on the witness stand" was an impermissible reference to the fact that he did not testify in his own defense.

The Court finds that the prosecutor's argument did not improperly comment on Petitioner's failure to testify. In order to conclude that the prosecutor's remarks amounted to an impermissible comment on petitioner's failure to testify, the Court "must find one of two things: that the prosecutor's manifest intention was to comment upon the accused's failure to testify or that the remark was of such a character that the jury would naturally and necessarily take it to be a comment of the failure of the accused to testify." *United States v. Robinson*, 651 F.2d 1188, 1197 (6th Cir. 1981) (internal quotations omitted); *accord Byrd v. Collins*, 209 F.3d 486, 533-34 (6th Cir. 2000); *Lent v. Wells*, 861 F.2d 972, 975 (6th Cir. 1988).

Here, the crux of the prosecutor's argument was that, the jury was able to still hear statements made to Merrill by the Petitioner, presented as evidence, since these statements were made during a prior conversation which was overheard by Sergeant Hall. While the comment regarding "testimony from the defendant, without him getting on the witness stand" statement should not have been made, the prosecutor's comment does not appear to be manifestly intended to comment on petitioner's failure to testify, nor would it necessarily have been taken as such a comment by the jury.

### 4. Prosecutor's Inflammatory Remarks

Petitioner argues that the prosecutor made remarks about Ms. Merrill and the Petitioner with the purpose inflaming the passions of the jury of jury. "[T]he cardinal rule [is] that a prosecutor cannot make statements 'calculated to incite the passions and prejudices of the jurors.'" *Bates v. Bell*, 402F.3d 635, 642 (6th Cir. 2005), (citing *Gall v. Parker*, 231 F.3d 265, 315 (6th Cir. 2000). Inflammatory remarks are improper because they "invoke emotions which may cloud the jury's determination of [the defendant's] guilt." *Martin v. Parker*, 11 F.3d 613, 616 (6th Cir. 1993) (citing *United States v. Payne*, 2 F.3d 706, 716 (6th Cir. 1993).

Petitioner argues:

> In the closing argument, the prosecutor made a number of remarks calculated to inflame the passions of the jury, referring to Crystal Merrill as a victim of the Petitioner, a "little farm girl" (T-1948) under the control of this man from the big city, (T-1953) a man who moved from place to place and lived with one relative and another, a man who was not like them but was a man who "doesn't go to work, mow his lawn, or talk to his kids." (T-1953). He was "dominating," "manipulative," "intimidating little farm girls," who he made his "property." All of this merely confirmed the prosecution strategy of making the Petitioner look like a bad person, in direct violation of the basic concept of fairness.

Pet. at 43-44.

A review of the characterization of Ms. Merrill as an uneducated, farm girl and of Petitioner as a savvy, charming, more sophisticated individual who uses more than one name to identify himself and who can be manipulative, is consistent with the trial testimony. Tr. 5/14/87, pp. 1948-1955. The Court does not find the prosecutor's remarks to be inflammatory, and denies habeas relief on this claim.

### 5. Prosecutor's Use of Irrelevant and Prejudicial Evidence and Testimony

Petitioner makes the following claim of prosecutorial misconduct:

The prosecution repeatedly elicited from witnesses such prejudicial but irrelevant material, seeking through these witnesses to portray the Petitioner as a violent man, a 'Ninja assassin,' a 'psychological terrorist.'" Witnesses were asked to describe the Petitioner as "frightening" (e.g. Heidi Bartel, Joplin, and John Manalli) and one who committed violent acts (e.g. Thomas Forde and Paul Demares) all of which had nothing to do with the victim in this case.

The prosecution displayed in the courtroom an inflammatory array of items which were never connected to the Petitioner and were never offered in evidence, including guns, knives, and other weapons, martial arts equipment, pornographic magazines and listening devices.

Pet. at 43. The "inflammatory items" were allowed over defense counsel's objection, initially to help the jurors understand Crystal Merrill's testimony. Tr. 4/29/87, pg. 387.

Prosecutorial misconduct must be so egregious as to deny petitioner a fundamentally fair trial before habeas corpus relief becomes available. *See, e.g. Donnelly v. DeChristoforo*, 416 US 637, 743-745 (1974). As outlined above, a prosecutor's remarks must be determined to be improper and flagrant in order to constitute prosecutorial misconduct. Petitioner argues that the prosecutor committed misconduct during the testimony of witnesses Heidi Bartel, Joplin, John Manalli, Thomas Forde, and Paul Demares. Petitioner argues that the witnesses were asked to describe him as frightening; a person who committed violent acts. The Court has reviewed the testimony of the aforementioned individuals. The prosecutor delved into the Petitioner's involvement with martial arts and questioned Bartel about Merrill's behavior after meeting Petitioner. None of the questions or answers rise to the level required for prosecutorial misconduct.

With respect to the "inflammatory items," it is significant that they were admitted into evidence by the trial court judge. "While framed as a prosecutorial misconduct challenge, it amounts in the end to a challenge to the trial court's decision to allow the introduction of this evidence. A prosecutor may rely in good faith on evidentiary rulings made by the state trial judge

and make arguments in reliance those rulings." *Webb v. Mitchell*, 586 F.3d 383, 397. (internal citations omitted).

## F. Actual Innocence

Respondent asserts that the habeas petition in this case should be time barred due to the lapses of time throughout the post-conviction proceedings in this matter. Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a one-year statute of limitations is applicable to an application of writ of habeas corpus pursuant to 28 U.S.C. §2244(d)(1) which provides that the one-year statute of limitations shall run from the latest of:

> "(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the application was prevented from filing by such State action; (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."

28 U.S.C. §2244(d)(1). The Court agrees that under a strict application of the limitations statute to this case, the matter would be time barred. However, equitable tolling applies where the Petitioner makes a credible claim of actual innocence. *Souter v. Jones*, 395 F.3d 577, 601 (6th Cir. 2005). To be credible, a claim of actual innocence must be supported by "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *see also Souter*, 395 F.3d at 600 (explaining that the actual innocence exception for time-barred claims is limited to the rare and extraordinary case where a habeas petitioner presents new evidence which undermines the reviewing court's confidence in the outcome of the trial). Petitioner must

demonstrate "that more likely than not any reasonable juror would have reasonable doubt" in light of new evidence. *House v. Bell*, 547 U.S. 518, 538 (2006).

A writ of habeas corpus may be granted "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The existence of new evidence, standing alone, is not a basis for granting the writ. As the Supreme Court has explained: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also*, *id*. at 404 (claim of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise [procedurally] barred *constitutional* claim considered on the merits.") (emphasis added); *Schlup v. Delo*, 513 U.S. 298, 314-16 (distinguishing, in part, *Herrera* because in this case the petitioner "accompanie[d] his claim of innocence with an assertion of constitutional error at trial."); *Townsend v. Sain*, 372 U.S. 293, 317 (1963) ("Of course, such evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."), *overruled in part on other grounds*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). The newly discovered evidence, standing alone, provides no basis for habeas relief.

However, the Court finds that the evidence detailed above including the affidavits and documentation regarding defense counsel's substance abuse problem comes within the realm of newly discovered evidence and would undermine the reviewing court's confidence in the outcome of the trial.   Therefore, Petitioner's habeas petition is equitably tolled, and the individual issues

presented for review are not procedurally defaulted.

## G. Insufficiency of Evidence & Great Weight of the Evidence

Petitioner claims that there was insufficient evidence to establish that he committed first-degree premeditated murder. Specifically, Petitioner contends that the prosecution failed to present legally sufficient evidence on the essential element of premeditation, thus violating his due process rights.

A federal habeas court has no power to grant habeas relief on the ground that a state conviction is against the great weight of the evidence. *Young v. Kemp*, 760 F.2d 1097, 1105 (11th Cir.1985). A claim that a verdict went against the great weight of the evidence is not of constitutional dimension, for habeas corpus purposes, unless the record is so devoid of evidentiary support that a due process issue is raised. *Griggs v. State of Kansas*, 814 F. Supp. 60, 62 (D. Kan.1993). The test for habeas relief is not whether the verdict was against the great weight of the evidence, but whether there was any evidence to support it. *United States ex. rel. Victor v. Yeager*, 330 F. Supp. 802, 806 (D.N.J.1971). Despite the general prohibition against federal habeas corpus review of issues of state law, *see Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (to the extent a petitioner's argument is based upon state law, the petitioner has failed to state a claim upon which habeas corpus relief may be granted), a claim that the evidence was insufficient to convict a petitioner is cognizable under 28 U.S.C. § 2254. Because the Due Process Clause "forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt," *Fiore v. White*, 531 U.S. 225, 228-229 (2001), "a state law question regarding the elements of the crime predicates the enforcement of [Petitioner's] federal constitutional right." *Richey v. Mitchell*, 395 F.3d 660, 672 (6th Cir. 2005).

The Due Process Clause of the Fourteenth Amendment protects an accused in a criminal case against conviction except upon proof beyond a reasonable doubt. *In re Winship*, 397 U.S. 358 (1970). The issue before this Court is whether sufficient evidence was presented to the jury from which a reasonable factfinder could find that the essential elements of the crime were proven beyond a reasonable doubt.

In resolving this issue, however, this Court is bound by two layers of deference to groups who may otherwise view the facts differently than the Court. *See Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008). First, as with all sufficiency-of-the-evidence-challenges, this Court must determine whether when "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In making this determination, the Court does not re-weigh the evidence, re-evaluate the credibility of witnesses, or substitute its judgment for that of the trier of fact. *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Therefore, even though the Court "might have not voted to convict a defendant had [it] participated in jury deliberations, [it] must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution." *Brown v. Kontech*, Nos. 06-4037/4043, slip op. at 13 (6th Cir. filed June 2, 2009).

Second, if the Court finds that the evidence was insufficient to convict under *Jackson*, the Court must apply a second layer of AEDPA deference and determine whether the state appellate court was "objectively reasonable" in concluding that a rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *Saxton*, 547 F.3d at 602. "The question 'is not whether

a federal court believes the state court's determination . . . was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2005)).

The habeas court must review all of the evidence in the record and determine whether a reasonable jury could have found guilt beyond a reasonable doubt. "The evidence must afford a substantial basis from which a fact in issue can reasonably be inferred." *Spalla v. Foltz*, 615 F.Supp. 224, 227 (E.D.Mich. 1985) (citing *Brown v. Davis*, 752 F.2d 1142, 1145 (6th Cir.1985)). As the *Spalla* court noted: "[t]he prosecution need not negate every reasonable theory consistent with innocence." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307 (1979); *Holland v. United States*, 348 U.S. 121 (1954). In fact, "[a] conviction may be sustained based upon nothing more than circumstantial evidence." *Saxton v. Sheets*, 547 F.3d 597, 606 (6th Cir. 2008) (citing *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006) ("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.")).

Here, Petitioner challenges the sufficiency of the evidence to support his first-degree premeditated-murder conviction, specifically arguing that the prosecution failed to prove beyond a reasonable doubt the element of premeditation. This Court must reject his challenge if, considering the evidence in the light most favorable to the prosecution, it concludes that a rational fact finder could have found that the elements of the crime were proven beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. In making this judgment, this Court must bear in mind that the beyond-a-reasonable-doubt standard, itself mandated by the Due Process Clause, requires the factfinder "to reach a subjective state of near certitude of the guilt of the accused [and] symbolizes the significance

that our society attaches to the criminal sanction and thus to liberty itself." *Id.* at 315.

Because a claim of insufficiency of the evidence presents a mixed question of law and fact, this Court must determine whether the state court's application of the *Jackson* standard was reasonable. *Johnson v. Hofbauer*, 159 F.Supp.2d 582, 596 (E.D. Mich. 2001). The *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324. Under Michigan law, the elements of first-degree murder are that the actor have an actual intent to kill, and that the intent must have been the result of premeditation and deliberation, rather than of a split-second, impulsive decision. *People v. Dykhouse*, 418 Mich. 488, 495 (1984). In other words, first-degree, premeditated murder, the form of first-degree murder charged in this case, requires a finding that Petitioner committed a homicide with premeditation and deliberation. *See People v. Morrin*, 31 Mich.App. 301, 328 (1971). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *Id.* at 329.

The question before this Court in the instant case is whether the evidence, taken together and viewed in the light most favorable to the prosecution, could allow any rational trier of fact to conclude beyond a reasonable doubt that Petitioner committed the elements of first-degree murder, specifically premeditation. *Warren v. Smith*, 161 F.3d 358, 360 (6th Cir.1998). In conducting such an inquiry this Court considers all the evidence presented in the record.

Under Michigan law, while the minimum time required to premeditate "is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a 'second look.'" *People v. Vail*, 393 Mich. 460, 469 (1975). "[A]n opportunity for a 'second look' may be merely seconds,

minutes, or hours, dependant on the totality of the circumstances surrounding the killing." *Johnson v. Hofbauer*, 159 F.Supp.2d at 596 (citing *People v. Berthiaume*, 59 Mich.App. 451, 456 (1975)). "One cannot instantaneously premeditate a murder" in Michigan, and although premeditation and deliberation can be inferred from the circumstances of the homicide, they cannot be the product of speculation. *People v. Plummer*, 229 Mich.App. 293, 301, 305 (1998). "The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing. Premeditation may be established through evidence of the following factors: (1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4). the defendant's conduct after the homicide." *Hofbauer*, 159 F. Supp. 2d at 596 (quoting *People v. Anderson*, 209 Mich. App. 527, 537 (1995)).

The Court finds that the elements of premeditation and deliberation were sufficiently established. The homicide appeared to have been carried out execution style, as the victim sustained a 12 gauge shotgun blast to his back and side area at close range. The prosecution produced several witnesses: (1) Crystal Merrill who testified about Petitioner's obsessive, jealous, controlling domineering nature; (2) Rene Gobeyn who testified that she saw Petitioner driving out of the college parking lot shortly after Mr. Macklem was shot with a telling expression on his face; (3) Philip Joplin, who testified that Petitioner confessed to killing Mr. Macklem while in a holding cell together in a very matter of fact manner[4]; (4) Richard Krueger, who testified that he saw Petitioner

---

[4]A reviewing court must consider all the evidence admitted by the trial court, even if the evidence was admitted erroneously. *McDaniel v. Brown*, __ U.S. __, __, 130 S. Ct. 665, 672 (2010) (per curiam opinion quoting *Lockhart v. Nelson*, 488 U.S. 33, 41 (1988)). Although the Court has granted habeas relief based on the perjured testimony of Joplin, because it was admitted at trial, the Court must consider it to determine whether a reasonable jury could reach a guilty verdict beyond a reasonable doubt.

before Mr. Macklem was shot and Petitioner appeared to be "intently" looking for someone; (5) and

Kathie Ballard and Jean Anter, who also attested to the "look" on Petitioner's face directly after the

shooting. The substantial testimonial evidence surrounding Mr. Macklem's murder—and the

reasonable inferences drawn from it—were sufficient to establish the elements of premeditation and

deliberation for first-degree murder.

In summary, there was sufficient evidence presented for a rational trier of fact to conclude

beyond a reasonable doubt that Petitioner actually killed and/or participated in the premeditated

killing of Mr. Macklem. Habeas relief is not warranted on this claim.

### H. Ineffective Assistance of Appellate Counsel

Petitioner argues that he brought several issues to the attention of his appellate attorney for

purposes of being raised on direct appeal. Because appellate counsel failed to do as Petitioner

requested, he claims that appellate counsel's legal representation was ineffective. It is well

established that a criminal defendant does not have a constitutional right to have appellate counsel

raise every non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). The

United States Supreme Court has explained:

> For judges to second-guess reasonable professional judgments and impose on appointed
> counsel a duty to raise every 'colorable' claim suggested by a client would disserve the ...
> goal of vigorous and effective advocacy . . . Nothing in the Constitution or our interpretation
> of that document requires such a standard.

*Id.* at 754.

Strategic and tactical choices regarding which issues to pursue on appeal are "properly left

to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir.

1990). In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out

48

weaker arguments on appeal and focusing on' those more likely to prevail." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (*quoting Barnes*, 463 U.S. at 751-52). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002).

Appellate counsel may deliver deficient performance and prejudice a defendant by omitting a "dead-bang winner," which is defined as an issue which was obvious from the trial record and would have resulted in a reversal on appeal. *See Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003); *Banks v. Reynolds*, 54 F.3d 1508, 1515 (10th Cir. 1995) (finding failure to raise a "dead bang winner" claim on appeal was constitutionally ineffective assistance of appellate counsel even though other strong claims were raised); *Page v. United States*, 884 F.2d 300, 302 (7th Cir. 1989)("The threshold question is not whether trial counsel was inadequate but whether trial counsel was so *obviously* inadequate that appellate counsel had to present that question to render adequate assistance. Counsel could be constitutionally deficient in omitting a 'dead-bang winner' even while zealously pressing other strong (but unsuccessful) claims.")**.**

Petitioner cites several claims that appellate counsel failed to raise on direct appeal: (1) trial counsel's drug addiction and its effect on his performance; (2) trial counsel's conflicts of interest; (3) trial counsel's failure to call the most critically necessary defense witness and other important witnesses; (4)  trial counsel's obstruction of the Petitioner's right to testify; (5) the police/prosecution threats designed to keep a critical witness from testifying; or (6) the perjurious testimony of Philip Joplin and intimidating tactics employed against him." Pet. pag. 33. Petitioner also states that appellate counsel should have raised the issue of Petitioner wearing prison garb in front of the jury as being improper, and trial court error in its issuance of an erroneous reasonable

doubt jury instruction. When a habeas petitioner alleges that his counsel was ineffective for failing to raise an issue on appeal, the Court examines the merits of the omitted issue. *U.S. v. Cook,* 45 F.3d 388, 392-93 (10th Cir. 1995); *U.S. v. Dixon,* 1 F.3d 1080, 1083 (10th Cir. 1993).

First, the Court notes that appellate counsel filed a strong and comprehensive brief on direct appeal, raising ten issues. However, an appellate attorney's assistance of counsel can still be deemed ineffective even though other strong claims were raised on direct appeal. See *Banks,* 54 F.3d at 1515. The Court has reviewed the merit of the six habeas claims, *supra.* The Court found that the following claims warranted habeas relief: (1) ineffective assistance of counsel due to defense counsel's failure to call the most critically necessary defense witness and other important witnesses; (2) trial counsel's obstruction of the Petitioner's right to testify; and (3) prosecutorial misconduct relative to the perjurious testimony of Philip Joplin. The Court finds that Petitioner's ineffective assistance of appellate counsel claim has merit.

With respect to trial counsel's substance abuse problem while representing Petitioner at trial, and its affect on counsel's overall representation of Petitioner at trial, although the Court did not find that habeas relief was warranted on that claim, the issue is one which could have resulted in a reversal on appeal.[5] Defense counsel's substance abuse problem, involvement with the criminal justice system as a result of his drug use, prior litigation where defense counsel was found to be ineffective based on his drug use, *supra,* allegations that defense counsel was stealing from Petitioner and/or Michelle Woodworth in order to support his drug habit,[6] and Petitioner's own

_____

[5]The Court notes that the ineffective assistance of counsel claims upon which habeas relief is granted in this case may have been attributed to defense counsel's drug abuse. However, Petitioner was not able to demonstrate the connection under *Strickland.*

[6]Pet., Ex. G, ¶ 32.

account of what he observed about defense counsel during the trial proceedings,[7] support an

argument on appeal that trial counsel was so *obviously* inadequate that appellate counsel had to

present the question of trial counsel's drug use to render adequate assistance. Certainly, evidence

of trial counsel's alleged use of drugs while representing Petitioner casts questions upon every

decision trial counsel made in his effort to represent Petitioner.

The Court finds that appellate counsel rendered ineffective assistance of counsel. Prevailing

upon this claim provides the requisite cause to overcome Petitioner's procedural default as it relates

to these claims. *Edwards v. Carpenter,* 529 U.S. 446, 451-52 (2000); *Burton v. Renico,* 391 F.3d

764, 774 (6th Cir. 2004).

## I. Cumulative Error

Petitioner claims he is entitled to habeas relief because of the cumulative effect of the alleged

errors in the state courts. The Michigan Court of Appeals rejected Petitioner's claim. *People v.

Freeman,* No. 103276 at 5. The Sixth Circuit noted that the Supreme Court "has not held that

distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle,* 291 F.3d

416, 447 (6th Cir. 2002). Petitioner is not entitled to habeas relief on this claim.

---

[7]Petitioner's affidavit testimony is as follows:
During much of the trial, Mr. Dean seemed confused and unfocused. He exhibited the signs of
one with a drug addiction, sometimes seeming unaware of his surroundings and saying things
that made no sense. He often smelled of recent substantial alcohol ingestion and appeared to be
intoxicated. Many of the calls made to Mr. Dean by affiant were of necessity made to him at a
bar, since that was the place where affiant was most likely to reach Mr. Dean. During much of
the trial, he seemed to take little interest in the proceedings and rarely objected to the admission
of evidence, including evidence that seemed to affiant to be inflammatory and improper. Affiant
understands that Mr. Dean was during this time of his life undergoing treatment for drug
addiction and was an alcoholic and that ths was common knowledge within the legal community
in St. Clair County." Pet. Ex.D, ¶44.

## VI. __CONCLUSION__

Accordingly,

IT IS HEREBY ORDERED THAT PETITIONER'S APPLICATION FOR WRIT OF HABEAS CORPUS IS CONDITIONALLY GRANTED. UNLESS THE STATE TAKES ACTION TO AFFORD PETITIONER A NEW TRIAL WITHIN NINETY (90) DAYS OF THE DATE OF THIS OPINION IF NO APPEAL IS TAKEN, OTHERWISE, WITHIN NINETY (90) DAYS AFTER ANY APPELLATE AVENUES ARE EXHAUSTED AND A MANDATE ISSUED, PETITIONER MAY APPLY FOR A WRIT ORDERING RESPONDENT TO RELEASE HIM FROM CUSTODY FORTHWITH.

IT IS FURTHER ORDERED that Respondent serve a copy of this Opinion and Order to the appropriate State Court and Prosecuting Attorney within fourteen (14) days' receipt of this Opinion and Order. Respondent must file a proof of service with the Court.

IT IS SO ORDERED.


S/Denise Page Hood
Denise Page Hood
United States District Judge


Dated: October 14, 2010


I hereby certify that a copy of the foregoing document was served upon counsel of record on October 14, 2010, by electronic and/or ordinary mail.

S/William F. Lewis
Case Manager